# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

NEY LEASING CORPORATION, INC.,

        **Plaintiff,**

vs.

CARGILL MEAT LOGISTICS SOLUTIONS, INC., f/k/a WISPAK TRANSPORT, INC.,

        **Defendant.**

No. C08-1041

ORDER FOR JUDGMENT

_____

## TABLE OF CONTENTS

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.    PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . 2

III.   RELEVANT FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
     A.     The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
     B.     Background Information . . . . . . . . . . . . . . . . . . . . 3
     C.     The Lease . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
     D.     Rent Payments . . . . . . . . . . . . . . . . . . . . . . . . . 4
     E.     Maintenance and Repair . . . . . . . . . . . . . . . . . . . 6
     F.     Condition Upon Return . . . . . . . . . . . . . . . . . . . . 7
     G.     Value of Returned Trucks . . . . . . . . . . . . . . . . . . 12
     H.     Two Destroyed Trucks . . . . . . . . . . . . . . . . . . . . 15
     I.     Heavy Use Tax . . . . . . . . . . . . . . . . . . . . . . . . 16

IV.    DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
     A.     Rent on Returned Trucks . . . . . . . . . . . . . . . . . . 17
     B.     Damage to Returned Trucks . . . . . . . . . . . . . . . . . 20
     C.     Trucks Destroyed in Motor Vehicle Accidents . . . . . . . . 24
     D.     Heavy Use Tax . . . . . . . . . . . . . . . . . . . . . . . . 26
     E.     Attorney Fees . . . . . . . . . . . . . . . . . . . . . . . . . 27

V.     SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

VI.    ORDER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

# I. INTRODUCTION

On the 8th and 9th days of February 2010, this matter came on for trial to the Court on the Petition (docket number 4) filed by the Plaintiff. Plaintiff Ney Leasing Corporation, Inc. ("NLC") was represented by Marvin Ney, and its attorney, Jeffrey L. Walters. Defendant Cargill Meat Logistics Solutions, Inc. ("Cargill") was represented by William P. Robison, and its attorneys, Jacob D. Bylund and Jesse R. Phelps.

# II. PROCEDURAL HISTORY

On November 5, 2008, NLC filed a Petition in the Iowa District Court for Dubuque County, seeking damages against Cargill for an alleged breach of contract. On December 2, 2008, the action was removed to the United States District Court for the Northern District of Iowa. On December 8, 2008, Cargill filed an answer, generally denying the material allegations and asserting certain affirmative defenses.

With the Court's permission, Cargill amended its answer on May 20, 2009 to assert a counterclaim. Cargill claimed that NLC breached an alleged amendment to the contract. On August 19, 2009, NLC answered Cargill's counterclaim, denying the material allegations.

On October 1, 2009, NLC filed a motion for summary judgment, asking that Cargill's counterclaim be summarily dismissed. On the same date, Cargill filed a motion for partial summary judgment, asking that the Court establish the measure of compensatory damages, and dismiss NLC's claim for punitive damages. On December 10, 2009, the Court granted NLC's motion and dismissed Cargill's counterclaim. The Court also dismissed NLC's claim for punitive damages.

As noted above, the petition came on for trial to the Court on February 8, 2010, and was completed on the following day.[1] Following the filing of post-trial briefs on March 9, the matter was deemed fully submitted.

---

[1] By agreement of the parties, the case was referred to the undersigned magistrate judge for final disposition, pursuant to 28 U.S.C. § 636(c). *See* docket number 9.

## III. RELEVANT FACTS

### A. The Parties

Plaintiff Ney Leasing Corporation, Inc. ("NLC") is an Iowa corporation, with its principal place of business located near Peosta, Iowa. NLC is wholly owned by Marvin Ney and his wife, Maria Ney. NLC was formed in April 1989 for the purpose of owning semi-tractor trucks and trailers.

At the same time they formed NLC, the Neys also established Ney Trucking. Ney Trucking leased equipment from NLC to transport food products. The Neys also own Top of the Class, Inc. According to Maria Ney, Top of the Class is "a land and property corporation," which was established to lease a facility to Ney Trucking. The Neys are the sole owners of all three companies.

The Defendant, Cargill Meat Logistics Solutions, Inc. ("Cargill"), is a corporation with its principal place of business in Wichita, Kansas. It is undisputed that Cargill assumed all the right, title, and interest of Wispak Transportation, Inc. ("Wispak") in a truck lease executed by Wispak and NLC on January 5, 2001.

### B. Background Information

Before it was acquired by Cargill, Wispak was involved in the transportation of food products. In late 1999 and early 2000, Wispak was "in a growth mode" and looking for trucking companies that "would provide synergy to [its] growing operation." Wispak did not own any trucks, and at that time was leasing from Penske, Ryder, and Airoldi Brothers. James Koeble, vice-president of Wispak, met with Marvin Ney and concluded that Ney would be a good general manager for the Wispak trucking operation. In addition, NLC and Ney Trucking would be able to provide equipment and drivers to Wispak, and also bring a "book of business." Accordingly, it was agreed that Ney would go to work for Wispak, and Wispak would lease trucks and trailers from NLC.[2]

---

[2] Ney was terminated from his employment in October 2002, after Wispak was purchased by Cargill. There is a separate lawsuit pending regarding a dispute between the
(continued...)

### C. The Lease

On January 5, 2001, NLC and Wispak entered into a "TRUCK LEASE." The lease was signed by Marvin L. Ney as president of NLC, and by James L. Koeble, as vice-president of Wispak. A copy of the lease was introduced at trial as Plaintiff's Exhibit 1.

In brief, NLC agreed to lease 13 trucks to Wispak, with Wispak agreeing to pay $1,600 per month per truck, or $20,800 per month total. In the proposed final pretrial order submitted by the parties, which was subsequently adopted by the Court, the parties stipulated that "the term of the Truck Lease was seventy two (72) months, with respect to each truck." Seven of the trucks were placed in service on September 1, 2001, five more trucks were placed in service on November 1, 2001, and the final truck was placed in service on January 1, 2002.

Two of the trucks were destroyed in motor vehicle accidents in 2005. Ten of the trucks were delivered by Cargill to Truck Country in late May and early June, 2008, with the final truck delivered to Truck Country on January 22, 2009.[3]

NLC claims that Cargill breached the contract by failing to pay the full amount of rent. NLC further claims that Cargill failed to properly maintain and repair the trucks, and that it failed to pay for the two trucks destroyed in the motor vehicle accidents. NLC also claims that Cargill owes it for unpaid "heavy use taxes." Finally, NLC seeks interest and payment of attorney fees.

### D. Rent Payments

Seven trucks – designated as Unit Nos. 880-886 – were placed in service in September 2001. In addition to September's rent, Cargill paid up front the "last month payment" for the seven trucks. Unit Nos. 881, 885, and 886 were delivered by Cargill

---

[2] (...continued)
parties on the trailer lease. *See Ney Leasing Corporation, Inc. v. Cargill Meat Logistics Solutions, Inc. f/k/a Wispak Transport, Inc.*, No. 2:09-cv-01051-JSS (N.D. Iowa). That case is scheduled for trial on November 8, 2010.

[3] When Koeble contacted Ney regarding the return of the trucks, he was instructed to return them to Truck Country in Dubuque, Iowa.

to Truck Country in May 2008. Unit Nos. 880, 882, and 884 were returned in June 2008. Unit No. 883 was destroyed in a motor vehicle accident on December 26, 2005.

In other words, from the time the first seven trucks were placed in service until they were returned to Truck Country, three of the trucks were in Cargill's possession for 81 months, three of the trucks were in Cargill's possession for 82 months, with the seventh truck destroyed prior to its return. It is undisputed that Cargill paid rent for 78 months on each of the trucks, including Unit No. 883, which was destroyed in a motor vehicle accident.[4]

Five more trucks (Unit Nos. 889, 890, 892, 893, and 894) were placed in service in November 2001, with the final truck (Unit No. 887) placed in service on January 1, 2002. Unit Nos. 889 and 893 were returned by Cargill in May 2008. Unit Nos. 887 and 890 were returned in June 2008. A fifth truck, Unit No. 894, was returned in January 2009. Unit No. 892 was destroyed in a motor vehicle accident on June 24, 2005.

Accordingly, of the six trucks placed in service in November 2001 and January 2002, one was in Cargill's possession for 78 months before being delivered to Truck Country, two were in Cargill's possession for 79 months, one was in Cargill's possession for 80 months, one was in Cargill's possession for 87 months, and the sixth truck was destroyed prior to its return. Including the double payment made when the trucks were placed in service, Cargill paid rent for 76 months on each of the five trucks placed in service in November 2001, and 74 months for Unit No. 887, which was placed in service in January 2002.

This information may be summarized in table form as follows:

| Unit Numbers | Placed in Service | Returned to Truck Country | Months in Cargill's Possession | Months of Rent Paid |
|---|---|---|---|---|
| 880 | Sept 2001 | June 2008 | 82 | 78 |
| 881 | Sept 2001 | May 2008 | 81 | 78 |

---

[4] Cargill's last rent payments were made in January 2008, but since it had earlier paid the "last month" rent, Cargill had effectively paid rent through February 2008.

| Unit Numbers | Placed in Service | Returned to Truck Country | Months in Cargill's Possession | Months of Rent Paid |
|---|---|---|---|---|
| 882 | Sept 2001 | June 2008 | 82 | 78 |
| 883 | Sept 2001 | Destroyed Dec 2005 | 52* | 78 |
| 884 | Sept 2001 | June 2008 | 82 | 78 |
| 885 | Sept 2001 | May 2008 | 81 | 78 |
| 886 | Sept 2001 | May 2008 | 81 | 78 |
| 887 | Jan 2002 | June 2008 | 78 | 74 |
| 889 | Nov 2001 | May 2008 | 79 | 76 |
| 890 | Nov 2001 | June 2008 | 80 | 76 |
| 892 | Nov 2001 | Destroyed June 2005 | 44* | 76 |
| 893 | Nov 2001 | May 2008 | 79 | 76 |
| 894 | Nov 2001 | Jan 2009 | 87 | 76 |

* For the trucks which were destroyed in accidents and not returned to NLC, the "months in possession" reflects the number of months the trucks were in service prior to their destruction.

### E.  Maintenance and Repair

The lease provided that Cargill "agrees to perform all maintenance and repairs to the Vehicles and agrees to supply all labor and parts required to keep the Vehicles in good operating condition." Cargill agreed in the lease "to maintain the Vehicles at scheduled times, pursuant to the factory maintenance schedule and directives," and to provide NLC with documentation "verifying completion of all scheduled maintenance and warranty work and other repairs."

The 13 trucks were placed in service between September 2001 and January 2002. Initially, the trucks were maintained by Airoldi Brothers Trucking. According to James A. Woyak, general manager of Airoldi Brothers, Cargill paid $175 per month, plus

6.5 cents per mile, for routine maintenance on the older trucks leased from NLC.[5] For the newer trucks, Cargill paid $350 per month and 5.9 cents per mile. Repairs not covered by the routine maintenance agreement were billed separately. According to Woyak, Airoldi Brothers maintained the vehicles in good operating condition.

The maintenance agreement between Cargill and Airoldi Brothers ended, however, on April 1, 2006. While the record is somewhat imprecise, Cargill then apparently used Custom Fleet to maintain the vehicles on a "pay-as-you-go" basis. That is, the trucks were not on a routine maintenance schedule, but were maintained and repaired as needed. That arrangement apparently continued "for a matter of months."[6] According to James Koeble, in mid-2006 Cargill "made the business decision to exit operating company trucks."

Most of the trucks sat parked and unused for the next two years.[7] They were not operated by Cargill, nor was there any maintenance performed on them. Initially, the trucks sat in the back lot at Airoldi Brothers for more than one year, until Airoldi Brothers asked that they be removed. At that time, they were "moved right around the corner" to a commercial truck and trailer wash. Woyak testified that while some of them were started and driven to the new location, "[s]ome of them we could not even get to run and they had to be pulled away."

### F. Condition Upon Return

James Koeble testified that in the fall of 2006, he went to Marvin Ney's home to discuss Cargill purchasing the trucks from NLC, which Koeble believed "was the most convenient way for both Ney and Cargill to conclude the deal." Koeble told Ney that

---

[5] The seven trucks placed in service on September 1, 2001 were 1999 models. The last six trucks placed in service were 2001 models.

[6] Plaintiff's Exhibit 26, pp 22-23, suggests Custom Fleet performed work on the trucks during the first several months of 2006.

[7] As set forth above, two of the trucks had been destroyed in accidents. One of the trucks, Unit No. 894, was subleased or sold by Cargill to Ernest Gadsen, and apparently continued to operate.

Cargill wanted to buy the trucks, and asked that Ney give him "a price." As a "style of negotiation," Koeble did not want to make the first offer. According to Koeble, there was another conversation in 2007 when Cargill again indicated that it was interested in buying the trucks. Koeble did not offer a specific dollar amount, however, and received no dollar demand from Ney. Koeble testified that a similar conversation between himself and Ney occurred after January 1, 2008. Apparently, however, no specific offer or demand was ever made.

Eventually, Koeble concluded that the parties would be unable to agree on the sale and purchase of the trucks, and a decision was made to return the trucks to NLC.[8] Koeble talked to Ney on the phone and was advised that the yard at Ney Trucking was unavailable. Ney told Koeble to deliver the trucks to Truck Country in Dubuque, Iowa. Kevin Gravel of Truck Country testified that he was contacted by Ney and told that the trucks were on the way. Ten of the trucks were delivered to Truck Country between May 29, 2008 and June 11, 2008. Of the remaining three trucks, two had previously been destroyed in motor vehicle accidents and the final truck was delivered to Truck Country on January 22, 2009.

The ten trucks returned in May and June of 2008 were driven from Milwaukee, Wisconsin, to Dubuque, Iowa. Custom Fleet performed the work necessary "to get them ready to run to be able to drive to Dubuque." Cargill paid $8,879.05 for repairs at that time, including $3,346 to replace the batteries in nine of the ten trucks. Upon their arrival in Dubuque, the trucks were inspected by employees at Truck Country. Kevin Gravel, an "outside service salesman" for Truck Country, testified regarding the inspections performed by Truck Country and the estimates prepared to bring the trucks up to "trade terms."

---

[8] The trucks were parked in the spring or summer of 2006. The lease expired in the fall of 2007. The trucks were not returned until May and June, 2008. When asked why the trucks were not returned to NLC immediately when the lease expired, Koeble testified that it "wasn't on anybody's radar screen to do that."

For example, according to Plaintiff's Exhibit 7, Unit No. 880 was inspected on June 18, 2008. A technician prepared a handwritten list of deficiencies on Unit No. 880, together with a DOT inspection checklist. Among other things, the truck had body damage, the fire extinguisher was empty, the brake pedal stuck, the right steer brake shoe was cracked, the turbo flex pipe was leaking exhaust, the flex pipe under the cab was broken, the power divider input was loose and leaking oil through splines, the wiper blades were defective, it had some exterior lights that were out, and it failed a "dyno" test. Truck Country estimated the cost of repairs, including taxes, at $11,009.55.[9]

Truck Country prepared similar estimates for each of the 11 trucks which were returned by Cargill. According to Truck Country, the cost of bringing the trucks up to "trade terms" may be estimated as follows:

| UNIT NUMBER | TRUCK COUNTRY ESTIMATE |
|---|---|
| 880 | $11,009.55 |
| 881 | 8,105.79 |
| 882 | 9,902.46 |
| 884 | 21,464.01 |
| 885 | 10,086.45 |
| 886 | 10,724.94 |
| 887 | 13,677.84 |
| 889 | 8,797.18 |
| 890 | 11,917.86 |

[9] As noted by Cargill, however, Truck Country erroneously calculated the taxes. In estimating the cost to repair the body work, Truck Country included taxes of 5.5 percent. When the total for the body work was then carried over to page one of an estimate sheet, taxes were calculated again at the rate of 7 percent. That total was then carried over to a cover sheet, with taxes again assessed at 7 percent. In other words, Truck Country added tax on tax on tax. By the Court's calculation, Truck Country overestimated the taxes on Unit No. 880 by $952.14.

| UNIT NUMBER | TRUCK COUNTRY ESTIMATE |
|:-----------:|:---------------------:|
| 893 | 5,585.36 |
| 894 | 10,028.05 |

*See* Plaintiff's Exhibits 7-18.

Maria Ney, president of NLC, testified that only two of the trucks – Unit Nos. 889 and 893 – were repaired following their return to NLC. Unit No. 889 was new when it was placed in service on November 1, 2001. When it was inspected following its return to NLC on May 29, 2008, it had traveled 393,489 miles. According to the technician's notes, it had body damage and needed dash lights, wiper blades, air conditioning and heater repairs, horn repair, fan belts, brake adjustments, and other repairs. Truck Country estimated the cost of repairs at $8,797.18, not including repairs to the bumper.[10] NLC claims, however, that the cost of actual repairs made to Unit No. 889 was $50,184.91. *See* Plaintiff's Exhibit 29. Among other things, NLC apparently paid $35,886.29 to overhaul the engine. Another major expenditure was $4,446.24 for eight new tires.

Similarly, Unit No. 893 was new when it was placed in service on November 1, 2001. When it was returned on May 29, 2008, it had traveled 484,100 miles. Among other things, the technician noted that the clutch needed adjustment, lights needed replacement, it needed wiper blades, the windshield washers didn't work, the rear view mirrors did not operate properly, the air conditioning was not working, the brakes needed repair, and there was body damage. Truck Country initially estimated the cost of repair at $5,585.36.[11] The Court notes that most of the inspection items identified on the DOT form were considered "ok." However, the actual repairs performed on Unit No. 893 totaled $36,972.77, including $30,287.46 to overhaul the engine and $4,446.24 for new tires.

---

[10] Again, Truck Country's estimate suffers from double taxation.

[11] Again, overstating the tax.

While Maria Ney testified that the remaining trucks were not repaired and not used by NLC, the evidence suggests that minor repairs were done on some of the other vehicles and they received limited use. For example, in September 2008, certain filters were replaced on Unit No. 880, at a cost of $146.01. Also in September 2008, the windshields were replaced in Unit Nos. 881 and 882, at a cost of $174.16 each. NLC also had minor repairs performed on Unit No. 885, totaling $193.67.

More extensive repairs were performed on Unit No. 886, including replacement of the windshield, repairs to exhaust system, replacement of lights, and other "general repair." The repairs to Unit No. 886 totaled $3,775.21. Similarly, NLC paid $3,136.57 for repairs to Unit No. 887, including $1,266.84 for body work completed by Seegers Truck & Trailer Repair in Cedar Rapids. When repairs were made in September 2008, it was necessary to reset the odometer to zero. On October 10, 2008, approximately two weeks later, additional repairs were performed and the miles were listed at 4,180. In other words, Unit No. 887 was placed back in use with only minimal repairs. The truck was apparently still being operated in March 2009.

The evidence also suggests that Unit Nos. 884 and 890 were used extensively by NLC. When Unit No. 890 was returned on June 11, 2008, it had 407,711 miles. On August 30, the odometer read 407,740 miles when repairs were done to the air conditioning and shift knob at a cost of $545.87. When additional repairs were done on September 12 at a cost of $347.27, the odometer read 413,028 miles. On September 14, repairs were performed in Salt Lake City, Utah, at a cost of $807.13. At that time, the odometer read 414,479 miles. On September 18, the odometer read 417,225 miles when additional repairs were completed at a cost of $394.84. A new tire was added the following day for $533.31.[12] When the oil and fuel filter were replaced on November 17 at a cost of $717.99, the odometer read 441,762 miles. In other words, with repairs

_____

[12] The invoice from Bauer Built places the mileage at 471,234 miles, but it would appear that the correct mileage was actually 417,234 miles.

totaling $3,346.41, during the 11 weeks between August 30 and November 17, Unit No. 890 was driven approximately 34,000 miles. NLC did not report any repairs to Unit No. 884, but the testimony of Mark Johannsen and a review of Plaintiff's Exhibit 11 suggests that it was also driven more than 30,000 miles following its return.

Cargill also suggests that Truck Country's estimates are inflated. For example, according to Truck Country's estimate, the cost of repairs for Unit No. 894 is $10,028.05, including replacing lights, replacing a cracked windshield, adjusting the clutch, performing body work, repairing an axle, and other general repairs. *See* Plaintiff's Exhibit 18. Kevin Gravel initially testified that the repairs were required to make the truck "road worthy" and pass DOT inspection. The estimate was prepared, however, in January 2010 – a full year after the truck was returned. On cross-examination, Gravel admitted that an estimate prepared by Truck Country in January 2009, when the truck was returned, put the cost of repairs at $6,552.09. That estimate was e-mailed to Ney on February 4, 2009. On February 23, 2009, another estimate was sent to Ney for Unit No. 894, placing the cost of repairs at $3,124.19. According to the e-mail, the repairs were "shortened up" to complete what was needed to pass the DOT inspection. According to an invoice dated March 19, 2009, the actual repairs to Unit No. 894 totaled $914.17. Marvin Ney testified that all of the returned trucks passed a DOT inspection before they were returned to service.

### G. Value of Returned Trucks

The Truck Lease provides that upon termination or expiration of the lease term, Cargill agrees to return the trucks "with no broken glass and with no sheet metal, component, or structural damage." Elsewhere in the agreement, Cargill agrees to perform all maintenance and repairs necessary to keep the trucks "in good operating condition." The parties apparently agree that these provisions required Cargill to return the trucks in a condition consistent with "trade terms."

The trucks were regularly maintained pursuant to a maintenance agreement with Airoldi Brothers until April 1, 2006. Cargill discontinued its trucking operation at around

that time, and the trucks remained parked until their return approximately two years later. According to NLC, when a truck sits unused for a substantial period of time, it adversely affects the brakes, starting systems, electrical systems, and engine. Cargill argues that after changing the batteries, most of the problems are easily remedied. In fact, Cargill argues that the value the truck is preserved, because additional mileage is not being added.

Mark Johannsen, used truck sales manager for Truck Country, testified regarding the value of the trucks after they were returned to NLC. According to Mr. Johannsen, he personally examined the trucks in August or September of 2008. However, in rendering his opinion, Mr. Johannsen valued the trucks as of April 2009. Mr. Johannsen determined an "as is" value, intended to reflect the value of the trucks in April 2009 in their current condition. Mr. Johannsen also established a "front line" value on the trucks, intending to reflect their retail value in good condition. *See* Plaintiff's Exhibit 20. On cross-examination, Mr. Johannsen conceded that the "trade term value" of a truck is something less than its "retail value." According to Mr. Johannsen, the "wholesale value" is lower still, with the "auction value" at the bottom. According to Mr. Johannsen, auction prices are subject to variables, including the weather, and are therefore "inconsistent."

Carl T. Schwab, president of Freightliner of Des Moines, Inc., testified as an expert witness for Cargill. According to Mr. Schwab, "trade terms" and "wholesale value" are "somewhat interchanged" and are "very close to" synonymous. After reviewing the inspection reports and repair estimates for the trucks, Mr. Schwab rendered an opinion as to their value "as is," their value if they had met "trade terms," and their retail value. *See* Defendant's Exhibit 173. In reaching his conclusions, Mr. Schwab relied, in part, on a published "true value guide" listing the prices of trucks sold at auction.

The Court believes that the opinions expressed by both experts have shortcomings. First, Mr. Johannsen values the trucks as of April 2009, rather than the summer of 2008, when they were returned. In addition, Mr. Johannsen opines regarding the retail value of the trucks, rather than establishing the trade terms value, which he admits would be lower. The retail value includes a profit margin to the dealer.

In April 2009, Mr. Johannsen placed the value of Unit No. 890 at $1,000, representing scrap value. As set forth above, however, Unit No. 890 was driven approximately 34,000 miles between the time it was returned to NLC on June 11, 2008, and when it was serviced on November 17, 2008. Accordingly, it can be presumed that Unit No. 890 had something more than "scrap value" at the time of its return to NLC. The Court also notes that the mileage recorded by Mr. Johannsen when he conducted his examination is inconsistent with his testimony that the examination occurred in August 2008.

On cross-examination, Mr. Johannsen testified regarding a similar spreadsheet which he prepared, dated February 3, 2009. *See* Defendant's Exhibit 111. The columns regarding unit number, make, model, VIN, year, and miles are identical. The "retail" values shown on the February 3, 2009 spreadsheet are identical to the "front line" values shown on the April 17, 2009. The "as is" column is replaced, however, by a "wholesale" column. According to a note found on the spreadsheet, the amounts are intended to reflect "the current retail and wholesale value per your request." The Court notes that the difference between the retail price and the wholesale price ranges from $7,000 to $7,900. The note states that in order to value the trucks as of 6/10/08, it would be necessary to "add approximately $3000 for both the wholesale and retail pricing." Accordingly, Mr. Johannsen's opinion of the wholesale values when the trucks were returned may be determined by adding $3000 to the amounts shown on Exhibit 111.

The testimony of Cargill's expert is also not without fault. When asked initially whether a customer interested in selling a truck would "bring it in," Mr. Schwab testified that "yes, usually they would, because we obviously need to look at the truck in order to put a value on it." Mr. Schwab then proceeded to place values on the trucks at issue in this case, without "needing to look" at any of them. Instead, Mr. Schwab relied on the technician's notes, DOT inspections, and repair estimates prepared by Truck Country. In a spreadsheet attached to Defendant's Exhibit 173, Mr. Schwab establishes an "as is"

value, a "trade terms" value, and a "retail" value on each of the trucks as of June 30, 2008.

The opinions of the respective experts can be compared in table form as follows:

| UNIT NO. | AS IS VALUE | | WHOLESALE/ TRADE TERMS | | FRONT LINE/ RETAIL | |
|---|---|---|---|---|---|---|
| | Johannsen (as of 4/17/09) | Schwab (as of 6/30/08) | Johannsen (as of 6/10/08) | Schwab (as of 6/30/08) | Johannsen (as of 6/10/08) | Schwab (as of 6/30/08) |
| 880 | $7,000.00 | $9,500.00 | $15,000.00 | $12,500.00 | $22,900.00 | $16,000.00 |
| 881 | 7,000.00 | 9,500.00 | 15,000.00 | 12,500.00 | 22,900.00 | 16,000.00 |
| 882 | 8,000.00 | 9,500.00 | 18,000.00 | 12,500.00 | 25,900.00 | 16,000.00 |
| 884 | 8,000.00 | 10,500.00 | 15,000.00 | 12,500.00 | 22,900.00 | 16,000.00 |
| 885 | 8,000.00 | 10,500.00 | 15,000.00 | 12,500.00 | 22,900.00 | 16,000.00 |
| 886 | 8,000.00 | 10,500.00 | 15,000.00 | 12,500.00 | 22,900.00 | 16,000.00 |
| 887 | 12,000.00 | 14,000.00 | 25,000.00 | 16,500.00 | 32,000.00 | 20,000.00 |
| 889 | 12,000.00 | 18,000.00 | 28,000.00 | 21,500.00 | 35,000.00 | 25,000.00 |
| 890 | 1,000.00 | 14,000.00 | 25,000.00 | 16,500.00 | 32,900.00 | 20,000.00 |
| 893 | 12,000.00 | 18,000.00 | 25,000.00 | 21,500.00 | 32,000.00 | 25,000.00 |
| 894 | 10,000.00 | 12,000.00 | 13,000.00 | 14,500.00 | 20,000.00 | 15,000.00 |

Part of the discrepancy may be attributed to Mr. Schwab's use of auction sales as a guide in determining value. According to Mr. Schwab, the reported sales of similar trucks in similar condition is useful as a guide in determining value. Mr. Johannsen, on the other hand, believes that auction sales are "inconsistent" and he does not use them in establishing value.

## H. Two Destroyed Trucks

Two of the 13 trucks leased from NLC by Cargill were destroyed in motor vehicle accidents. NLC argues that Cargill is responsible not only for the depreciated value of the trucks at the time of the accidents, but is also required to pay rent on the trucks until the time of trial. Cargill concedes that it is required to pay NLC for the value of the trucks,

as determined by the lease, but argues that it should receive credit against those amounts for the rents paid following the trucks' destruction.

Unit No. 883 was placed in service on September 1, 2001, and destroyed in a motor vehicle accident on December 26, 2005, after 52 months in service. Cargill continued to pay rent on the truck, however, through February 2008, or for a total of 78 months. That is, Cargill paid $41,600 rent on Unit No. 883 *after* it was destroyed in an accident. The parties agree that the Truck Lease requires Cargill to pay NLC for the depreciated value of the truck at the time of the accident. Here, the parties agree that the depreciated value of Unit No. 883 at the time of the accident was $23,355.25.

Unit No. 892 was placed in service on November 1, 2001 and destroyed in a motor vehicle accident on June 24, 2005, after nearly 44 months of service. Cargill paid rent through February 2008, for 76 months. That is, Cargill paid $51,200 in rent *after* the truck was destroyed. The parties agree that the depreciated value of Unit No. 892 at the time of the accident, as calculated pursuant to Schedule A of the Truck Lease, was $54,476.25.

### I. Heavy Use Tax

The Truck Lease required Cargill to pay all taxes on the vehicles, including the federal heavy vehicle use taxes. Apparently, NLC would routinely pay the tax of $550 per truck, and then bill Cargill for reimbursement. Maria Ney, president of NLC, testified that Cargill paid the heavy use tax "through July of 2008." All but one of the trucks was returned in May and June 2008. NLC argues, however, that Cargill should be required to pay "at least a prorata amount until the date the rental payments ended." In fact, NLC argues that Cargill owes heavy use tax for one year on Unit Nos. 883 and 892, despite the fact that the trucks were destroyed in motor vehicle accidents in 2005, and NLC stopped

paying heavy use tax on those trucks in 2007.[13] Cargill concedes that it owes heavy use tax on Unit No. 894, which was not returned to NLC until January 2009.

## IV. DISCUSSION

### A. Rent on Returned Trucks

NLC claims that Cargill owes additional rent on the returned trucks.[14] Specifically, NLC argues that Cargill is required to pay rent until the trucks were returned, plus two additional months. Cargill argues that, with the exception of Unit No. 894, it was not operating the trucks after the lease term expired, and it does not owe additional rent.

The parties stipulated that the truck lease was for a term of 72 months. Seven of the trucks were placed in service in September 2001, five more trucks were placed in service in November 2001, and the final truck was placed in service in January 2002. Accordingly, the initial term of the lease would have expired at the end of August, October, and December 2007, respectively. The trucks were not returned until May and June 2008, however, with Unit No. 894 not being returned until January 2009.

In arguing that it does not owe rent while the trucks remained in its possession, Cargill notes that Koeble attempted to negotiate a resolution of the lease agreement with Ney. Cargill asserts that when it became apparent that no agreement would be reached, it "promptly" returned the trucks after Koeble received direction from Ney regarding where the trucks should be delivered. According to Cargill, it does not owe rent after the termination of the original lease term, because it did not "operate" the trucks during that time.

The Truck Lease provides for the establishment of a "hold-over lease" if Cargill continues to "operate" a truck after the lease term expires.

---

[13] Maria Ney testified that NLC paid a heavy use tax on Unit Nos. 883 and 892 "in '05 and '06" and stop paying in "'07 and '08." Nonetheless, NLC continued to charge Cargill, and Cargill apparently paid, heavy use tax which was never paid by NLC.

[14] NLC also claims that Cargill owes rent on the two trucks that were destroyed in motor vehicle accidents. The Court will address that issue separately.

> The lease term for a Vehicle will begin when NLC tenders the Vehicle to you and will last for the period specified on its Schedule A unless the lease term is terminated earlier as permitted by this Agreement. At the end of the lease term, you agree to return the Vehicles to NLC. **If you operate any Vehicle after its lease term has ended, the terms of this Agreement will apply to the hold-over lease, but NLC will have the right to terminate the hold-over least [*sic*] 7 days after NLC sends you written notice.**

Truck Lease, ¶ 1(C) at 2 (Plaintiff's Exhibit 1) (emphasis added).

The term "operate" is not defined in the Truck Lease. It defies common sense, however, to conclude that Cargill can retain possession of the trucks, thereby depriving NLC of their use, but avoid continuing responsibility under the lease because the trucks are not being "operated."[15] The Court is not persuaded by Cargill's argument that the delay in returning the trucks is attributable to NLC. Koeble admitted that it simply wasn't on Cargill's "radar" to return the trucks at the end of the lease term. Accordingly, the Court concludes that when Cargill failed to return the trucks at the conclusion of the 72-month lease, a hold-over lease was established on the same terms and conditions of the original lease. Cargill is responsible for rent while the trucks remained in its possession.

In support of its argument that Cargill owes an additional two months' rent following the trucks' return, NLC points to paragraph 14(A) of the Truck Lease, which states:

> Notwithstanding anything in the Agreement to the contrary, you have the option to terminate any Vehicles listed in Schedule A after 66 months after the date of in-service by giving NLC 60 days written notice. If termination is effective by you, you will have neither the right nor the obligation to purchase the terminated Vehicle(s) but will remain liable for all other amounts owed to NLC under this Agreement, until the Vehicle(s) are returned to NLC.

---

[15] Indeed, Cargill apparently does not argue that its obligation to pay rent ended after 72 months. Rather, in its post-trial brief, Cargill states that the "issue presented" is whether NLC is entitled to rent payments after February 2008.

Truck Lease, ¶ 14(A) at 7 (Plaintiff's Exhibit 1).

Once again, the Truck Lease is not a model of clarity. However, nothing in paragraph 14(A), or elsewhere in the lease, requires Cargill to give a 60-day notice before terminating a hold-over lease.[16] Simply put, paragraph 14(A) does not address any notice required at the end of the lease term, or the end of a hold-over lease. The Court concludes that Cargill's responsibility for rent ended when the trucks were returned to NLC. Accordingly, Cargill is responsible for additional rent owed after February 2008 and until the trucks' return.

NLC claims the right to recover interest on the unpaid rent at the rate of 1-1/2 percent per month. However, nothing in the Truck Lease provides for the accrual of interest on unpaid rent. Nonetheless, NLC is entitled to common law recovery of interest on amounts owed. *Vasquez v. LeMars Mut. Ins. Co.*, 477 N.W.2d 404, 406 (Iowa 1991) ("Iowa follows the general rule that interest runs from the time the money becomes due and payable."). The Court concludes that NLC is entitled to interest on the unpaid amounts at the statutory rate of 5 percent. *See* Iowa Code § 535.2. *See also Happy Chef Systems, Inc. v. John Hancock Mut. Life Ins. Co.*, 933 F.2d 1433, 1435 (8th Cir. 1991) (in a diversity action in federal court, state law governs pre-judgment interest).

The additional rent and interest owed on the 11 returned trucks may be illustrated in table form as follows:

| UNIT NUMBERS | ADDITIONAL RENT OWED | INTEREST OWED |
|:---:|:---:|:---:|
| 880 | $6,400.00 | $680.00 |
| 881 | 4,800.00 | 520.00 |
| 882 | 6,400.00 | 680.00 |

---

[16] While the Truck Lease was apparently "modeled" after other leases used in the industry, it was apparently prepared by NLC. Ambiguous terms in a contract are construed against the drafter. *DeJong v. Sioux Center, Iowa*, 168 F.3d 1115, 1121 (8th Cir. 1999) (applying Iowa law).

| UNIT NUMBERS | ADDITIONAL RENT OWED | INTEREST OWED |
|---|---|---|
| 884 | 6,400.00 | 680.00 |
| 885 | 4,800.00 | 520.00 |
| 886 | 4,800.00 | 520.00 |
| 887 | 6,400.00 | 680.00 |
| 889 | 4,800.00 | 520.00 |
| 890 | 6,400.00 | 680.00 |
| 893 | 4,800.00 | 520.00 |
| 894 | 17,600.00 | 1,613.00 |
| TOTAL | $73,600.00 | $7,613.00 |

## B. Damage to Returned Trucks

The lease required Cargill to perform all maintenance and repairs necessary to keep the trucks "in good operating condition." The lease further provided that upon expiration of the lease term, Cargill agreed to return the trucks "with no sheet metal, component, or structural damage." While the term is apparently not used in the lease, the parties generally agree that Cargill was required to return the trucks in compliance with "trade terms."

It is undisputed that the trucks did not meet "trade terms" upon their return. While Cargill installed new batteries and made other minor repairs in order to drive the trucks from Milwaukee to Dubuque, the trucks needed repairs to the brakes, lights, windshields, and other component parts, in addition to more substantial repairs. NLC claims that the cost of repairs needed to bring the trucks up to trade terms are accurately represented by Defendant's Exhibits 7-18. Carl Schwab, who testified as Cargill's expert, conceded the trucks "most definitely" were not in trade terms when returned, but opined that the estimates were "nit-picked" and "seem high." Cargill argues that the estimates prepared by Truck Country greatly exaggerate that which was necessary to bring the trucks up to

"trade terms," as illustrated by the fact that a number of the trucks were placed back in service with only minimal repairs. NLC responds that meeting "trade terms" requires substantially more than simply passing a DOT inspection.

In its ruling on Cargill's motion for partial summary judgment, the Court discussed the proper measure of damages under these circumstances. *See* Ruling on Motions for Summary Judgment at 12-14 (docket number 40 at 12-14). That discussion will not be repeated here. In summary, however, the Court concludes that the measure of damages for the 11 returned trucks may be stated as follows:

> (1)     When the motor vehicle is totally destroyed or the reasonable cost of repair exceeds the difference in reasonable market value before and after the injury, the measure of damages is the lost market value.

> (2)     When the injury to the motor vehicle can be repaired so that, when repaired, it will be in as good condition as it was in before the injury, and the cost of repair does not exceed the difference in market value of the vehicle before and after the injury, then the measure of damages is the reasonable cost of repair.

> (3)     When the motor vehicle cannot by repair be placed in as good condition as it was in before the injury, then the measure of damages is the difference between its reasonable market value before and after the injury.

*Papenheim v. Lovell*, 530 N.W.2d 668, 671 (Iowa 1995) (citing *Long v. McAllister*, 319 N.W.2d 256, 261 (Iowa 1982)). As applied to the facts in this case, the measure of damages is (1) the reasonable cost of repairing the trucks to bring them up to trade terms, or (2) the difference between the value of the trucks when they were returned and their value if they had been compliant with trade terms, whichever is less.[17]

---

[17] NLC states in the Final Pretrial Order that it "is entitled to either the cost of repair or the diminution in value."

The parties offered expert testimony regarding the value of the trucks in their "as is" condition upon their return. The experts also opined regarding the value of the trucks if they had been in "trade terms" condition upon their return. The Court found the testimony of Mr. Schwab to be the most credible in that regard.[18] Mr. Schwab is president of Freightliner of Des Moines, and has extensive experience in the purchase and sale of the types of trucks involved here. Notwithstanding Mr. Johannsen's testimony that auction sales are inconsistent, the Court finds that Mr. Schwab's reference to sales guides, which report actual sales of the same model trucks in similar condition, to be a reliable measure of value. Mr. Schwab testified that by not being compliant with trade terms, the trucks were reduced in value between $2,000 and $3,500, as reflected in the table set forth on page 15.[19]

For each of the returned trucks, the cost of repair estimated by Truck Country exceeds the reduction in value found by Mr. Schwab. Cargill asserts, however, that the *actual* cost of bringing the trucks up to trade value is less than Truck Country's estimates, and less than the reduction in value resulting from their "as is" condition. Accordingly, Cargill argues the actual repairs performed by NLC is the measure of damage.

The Court agrees that the repair estimates submitted by Truck Country appear to be inflated. The trucks were apparently in good operating condition when Airoldi Brothers stopped performing routine maintenance on April 1, 2006. The trucks were parked shortly after that time. James Woyak, the general manager at Airoldi Brothers, testified that when a truck sits for an extended period of time, the brakes will become "hung up," the starting system will fail, the electrical connections may become corroded, and the chassis greases

---

[18] The Court notes, among other things, that NLC's expert, Mr. Johannsen, and Marvin Ney both live in the same small town of Peosta, Iowa. In addition, Mr. Johannsen serves as used truck sales manager for Truck Country and does business with Ney on an annual basis.

[19] In its post-trial brief, NLC uses "frontline" values in determining diminution in value. But the frontline, or retail, value does not reflect the trade terms value.

or lubricants will dry out. According to Mr. Schwab, however, these problems are generally easily remedied. Marvin Ney conceded that many of the repairs were "easy to do" and he performed them himself in order to keep the costs down. While the Court is unable to precisely determine the reasonable cost of repair on this record, it nonetheless finds that the cost of repairing the trucks to bring them up to trade terms is likely more than their reduction in value as a consequence of being returned "as is." Accordingly, the Court concludes that NLC's damages are reflected by the reduction in value.[20]

In addition, the Court concludes that NLC is entitled to recover the reasonable value of the use of the trucks during the time reasonably required to bring them up to trade terms. *Papenheim*, 530 N.W.2d at 673. Without any particular support in the record, NLC suggests that time should be three months. The Court concludes that the repairs necessary to meet trade terms could have been completed within one month. *Id.* (rejecting the Plaintiff's claim for 13 weeks, and reducing recovery for loss of use to three weeks). The reasonable value for use of the trucks is reflected by the monthly rent. Therefore, the Court will award one additional month's rent for each of the eleven trucks returned.

The Court further concludes that NLC is entitled to pre-judgment interest at the statutory rate of 5 percent, from the time the trucks were returned in their deficient condition. Accordingly, because the trucks did not meet trade terms upon their return to NLC, Cargill is responsible for the following additional damages:

| UNIT NUMBERS | REDUCED VALUE | INTEREST OWED | LOSS OF USE | INTEREST OWED |
|---|---|---|---|---|
| 880 | $3,000.00 | $312.50 | $1,600.00 | $166.67 |
| 881 | 3,000.00 | 325.00 | 1,600.00 | 173.33 |

---

[20] The Court recognizes that in some cases the trucks were repaired and placed back in service for less than the reduction in value found by Mr. Schwab. While those trucks apparently passed a DOT inspection and were deemed roadworthy, there is no evidence that they met trade terms when placed back in service.

| UNIT NUMBERS | REDUCED VALUE | INTEREST OWED | LOSS OF USE | INTEREST OWED |
|---|---|---|---|---|
| 882 | 3,000.00 | 312.50 | 1,600.00 | 166.67 |
| 884 | 2,000.00 | 208.33 | 1,600.00 | 166.67 |
| 885 | 2,000.00 | 216.67 | 1,600.00 | 173.33 |
| 886 | 2,000.00 | 216.67 | 1,600.00 | 173.33 |
| 887 | 2,500.00 | 260.42 | 1,600.00 | 166.67 |
| 889 | 3,500.00 | 379.17 | 1,600.00 | 173.33 |
| 890 | 2,500.00 | 260.42 | 1,600.00 | 166.67 |
| 893 | 3,500.00 | 379.17 | 1,600.00 | 173.33 |
| 894 | 2,500.00 | 187.50 | 1,600.00 | 120.00 |
| TOTAL | $29,500.00 | $3,058.35 | $17,600.00 | $1,820.00 |

### C. *Trucks Destroyed in Motor Vehicle Accidents*

Two of the trucks, Unit Nos. 883 and 892, were destroyed in motor vehicle accidents. NLC continued to send Cargill invoices for the destroyed trucks, however, and Cargill continued to pay rent. In fact, NLC claims that Cargill continues to owe rent on the trucks because they have not been returned.

The parties agree that the truck lease provides a formula for determining the value to be placed on a vehicle destroyed by accident. In their respective post-trial briefs, the parties agree that pursuant to Schedule A of the lease, Unit No. 883 had a depreciated value of $23,355.25 when it was destroyed in an accident on December 26, 2005. Similarly, the parties agree that Unit No. 892 had a depreciated value of $54,476.25 when it was destroyed in an accident on June 24, 2005. The parties agree that Cargill is contractually obligated to pay those amounts as compensation for the destroyed trucks.

Cargill argues, however, that it is entitled to credit for rent payments made after the trucks were destroyed. While both trucks were destroyed in 2005, Cargill continued to pay rent on the trucks through February 2008. NLC argues that not only is Cargill not

entitled to credit for rents paid after the trucks were destroyed, Cargill continues to owe rents because the trucks have not been returned.

Paragraph 12 of the Truck Lease requires Cargill to immediately notify NLC of any accident. While there is some dispute in the record, the Court concludes that a preponderance of the credible evidence established that NLC received actual notice within 30 days after the respective accidents.[21] The lease further provides that NLC will then decide whether the truck is damaged beyond repair and, if so, "the lease on that Vehicle will terminate once you pay NLC all of the charges owed for the Vehicle and all amounts owed under Paragraph 11." For whatever reasons, the parties failed to "settle up" when the trucks were destroyed. Instead, NLC continued to send invoices for monthly rent, and Cargill continued to pay it.[22] Now, in an effort to eat its cake and have it too, NLC asks that it be permitted to retain the rent payments (plus some additional rent) and collect for the value of the trucks pursuant to the contract.

The Court finds that nothing in the Truck Lease permits NLC to recover rent on trucks which have been totally destroyed. Instead, the lease provides that when a truck has been destroyed in a motor vehicle accident, Cargill is required to pay NLC for the truck's depreciated value, pursuant to a formula found in Schedule A. The Court concludes that when a truck is destroyed in an accident, the lease fixes Cargill's responsibility to pay NLC the depreciated value of the truck, and its responsibility to pay rent is concomitantly terminated.

The parties agree that the depreciated value for Unit No. 883 at the time of its destruction was $23,355.25. The Court concludes that NLC is entitled to recover that

---

[21] Marvin Ney testified that he didn't know Unit No. 883 was destroyed until the trucks were returned, but Maria Ney admitted that she knew the truck was destroyed, and NLC stopped paying heavy use tax on it.

[22] NLC claims it sent an invoice (Plaintiff's Exhibit 28) to Cargill for the depreciated value of Unit No. 892, but Koeble testified he did not see it. Cargill notes that the invoice is not included in the comprehensive production of invoices (Plaintiff's Exhibit 2), nor is it referred to in a spreadsheet showing invoices and payments.

amount, plus interest at the statutory rate from December 2005. By the Court's calculation, the amount owed by Cargill for Unit No. 883, including interest, is $28,707.49. Since Cargill was not required to pay rent on a truck which was totally destroyed in a motor vehicle accident, the Court concludes that it is entitled to credit for rents paid after December 2005, in the amount of $41,600.[23] Accordingly, Cargill has overpaid $12,892.51 on Unit No. 883.

Similarly, pursuant to the Truck Lease, Cargill is required to pay $54,476.25 for Unit No. 892, plus interest at the statutory rate from June 2005. By the Court's calculation, the total amount owed for Unit No. 892, including interest, is $68,322.30. After the truck was destroyed in the accident, Cargill continued to pay rent totaling $51,200. Accordingly, Cargill owes an additional $17,122.30 for Unit No. 892.

By combining the overpayment made by Cargill on Unit No. 883 ($12,892.51), with the amount due by Cargill on Unit No. 892 ($17,122.30), the Court concludes that Cargill owes an additional $4,229.79 for the two trucks destroyed in motor vehicle accidents in 2005.

## D. Heavy Use Tax

NLC argues in its post-trial brief that Cargill owes $7,150 for reimbursement of heavy use taxes. Inexplicably, NLC claims that Cargill even owes heavy use tax on Unit Nos. 883 and 894, despite the fact that they were destroyed in motor vehicle accidents in 2005 and NLC stopped paying heavy use taxes on them in 2007. NLC concedes that Cargill has paid the heavy use taxes through July of 2008. With the exception of Unit No. 894, the Court has concluded that the lease terminated for the returned trucks in May and June, 2008. Accordingly, Cargill does not owe any heavy use taxes on those trucks. Cargill agrees to pay heavy use tax for Unit No. 894, which was not returned until January 2009.

_____

[23] The Court concludes, however, that Cargill is not entitled to interest on rents which it voluntarily, albeit erroneously, paid.

### E.  Attorney Fees

Finally, NLC asks that it be awarded attorney fees and costs.  The Truck Lease provides, in part, as follows:

> If NLC takes any action to enforce any of NLC's rights under this Agreement or to collect amounts owed by [sic] NLC by you, you agree to pay all of NLC's costs and expenses in doing so.  These costs will include, but not be limited to, NLC's reasonable attorneys' fees at both the trial and appellate level, and fees and costs paid to any collection agency.

Truck Lease, ¶ 15(D) at 8 (Plaintiff's Exhibit 1).

In its post-trial brief, NLC "reserves the right to file [a] separate motion requesting reasonable attorney fees and costs."  In its post-trial brief, Cargill denies that NLC is entitled to attorney's fees, but agrees that "the subject of attorney's fees will be addressed through a cost motion following the Court's ruling in this matter."  The Court concludes that the issue of attorney fees will be addressed in accordance with FEDERAL RULE OF CIVIL PROCEDURE 54(d) and Local Rule 54.1.

## V.  SUMMARY

In summary, the Court concludes that Cargill is required to pay rent for the returned trucks through the month in which they were returned.  The additional rent owed, plus pre-judgment interest at the statutory rate, totals $81,213.  In addition, NLC is entitled to damages associated with Cargill's failure to return the trucks in "trade terms" condition.  The damages for reduction in value, including interest, total $32,558.35.  The damages for loss of use, including interest, total $19,420.  After receiving credit for amounts previously paid, Cargill also owes an additional $4,229.79 for the two trucks destroyed in motor vehicle accidents in 2005.  Finally, Cargill owes $550 for the heavy use tax assessed on Unit No. 894.  Accordingly, Cargill owes NLC a total of $137,971.14.  Interest will accrue on the judgment from and after the filing of this Order.

The Court reserves ruling on the issue of attorney fees.

## VI. ORDER

IT IS THEREFORE ORDERED that judgment enter in favor of Plaintiff Ney Leasing Corporation, Inc. and against Defendant Cargill Meat Logistics Solutions, Inc. in the amount of One Hundred Thirty-Seven Thousand Nine Hundred Seventy-One Dollars and fourteen cents ($137,971.14), plus interest at the federal statutory rate from and after the date of filing of this Order.

DATED this 9th day of June, 2010.

_____
JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA